NORMAN H. MOORE & another *vs.* ZONING BOARD OF APPEALS OF MIDDLEBOROUGH.

Plymouth. November 4, 1971. — December 15, 1971.

Present: TAURO, C.J., CUTTER, REARDON, BRAUCHER, & HENNESSEY, JJ.

*Zoning*, Mink ranch. *Mink. Words,* "Farm."

A town zoning by-law permitting in a residence district "farms, nurseries and buildings thereon devoted to agricultural purposes" did not allow the operation of a mink farm in such a district; it was irrelevant that G. L. c. 128, § 8B, inserted by St. 1969, c. 37 § 2, provided that certain mink were "domesticated mammals" and that the "breeding, raising, producing in captivity and marketing thereof shall be deemed an agricultural pursuit." |632-634|

BILL IN EQUITY filed in the Superior Court on February 5, 1968.

The suit was heard by *Lurie,* J.

*George C. Decas* for the defendant.

*Felix F. Perrone* for the plaintiffs.

CUTTER, J. The Moores own about four acres of land (locus) in a district zoned for residences by the Middleborough zoning by-law. Two acres are cleared and two are woodland. The Moores reside on the locus and since 1966 have used a portion (the mink area) of the land (150 feet by 130 feet), enclosed by a wire mesh fence, for raising and breeding mink. The mink area contains a wood and wire shed about twelve feet by 118 feet. An additional and similar shed is in the process of construction. The sheds will house 160 female breeders and forty male breeders throughout the year. There will be 500 to 600 young mink

from May until November each year. The locus is "well maintained for the purposes" of its present use.[1]

The zoning by-law (§ IV A 1) lists among the uses permitted in a residence district "c. Farms, nurseries and buildings thereon devoted to agricultural purposes." The by-law was adopted June 16, 1958.[2] It contains no definitions of "farm" or of "agricultural purposes."

About September 26, 1967, the selectmen, acting through the town manager, ordered the Moores to cease operating the mink farm within thirty days of receipt of the order. Upon appeal to the town's zoning board of appeals, the board, after hearing, voted to deny the Moores' request for review of the selectmen's order. Upon this bill in equity under G. L. c. 40A, § 21, the facts were agreed. A Superior Court judge properly treated the matter as presented upon a case stated. On September 9, 1968, an order for a decree (remanding the matter to the board for a de novo hearing) was made prior to our decision on April 2, 1969, in *Commonwealth* v. *Proctor*, 355 Mass. 504. After that decision, a final

---

[1] The record shows the following further facts, among others: "The mink are raised for . . . their pelts . . . [which are] sold on the wholesale fur market. The young mink are graded and then killed by the injection of a chemical into their lungs. This is done either inside the shed or in the [mink] area . . . . The . . . pelts are removed . . . in the outside area and . . . then transported elsewhere for scraping. The Moores have a small vegetable garden on their premises for their . . . use only. None of the feed required by the mink is produced on the . . . [locus] but is . . . brought on to the . . . [locus] in buckets. This feed is a processed combination of fish, horse meat, chicken, cheese, tomatoes, cottage cheese, liver, and other ingredients." The owners of land immediately adjacent to the locus did not object to the mink ranch. More distant neighbors did object. There was reference to a "potential odor, nuisance, and rat problem."

[2] The selectmen constitute the enforcing agency under the by-law (§ VII B). Section VII A 1 provides in part: "Before any dwelling, building, or structures (except farm buildings and farm structures other than dwellings) of one hundred fifty square feet or more in area on the ground or eight feet or more in height is erected . . . on any lot in all types of districts, the applicant shall file a petition for a permit with the [s]electmen . . . with a plot plan drawn substantially to scale which shall show the lot dimensions, adjacent ways, the location of dwellings, building, or structures already on the lot, and the exact size and location of the dwelling, building, or structure proposed to be erected . . . and a statement of the intended use of the premises, buildings, and structures existing and proposed. If such proposed dwelling, buildings, or structures and use thereof . . . conform to the provisions of this [b]y-[l]aw, the [s]electmen shall take final action on all petitions for permits within thirty days of their filing."

decree was entered on September 15, 1969, sustaining the Moores' appeal from the selectmen's order and ruling that the "operation . . . of a mink farm is within the [z]oning [b]y-law and that the order of the . . . [s]electmen is illegal and void."

1. Prior to the adoption of the by-law, the term "farms" under somewhat similar zoning by-laws had been held not to include the peculiarly offensive occupation (see *Pendoley* v. *Ferreira*, 345 Mass. 309, 312–313) of raising pigs for market, see *Lincoln* v. *Murphy*, 314 Mass. 16, 19–22, or the raising of greyhounds. See *Mioduszewski* v. *Saugus*, 337 Mass. 140, 145. More recently (*Hume* v. *Building Inspector of Westford*, 355 Mass. 179, 181–182) maintenance of a dog kennel was held not to be a permissible accessory use in a residential area. Cf. *Jackson* v. *Building Inspector of Brockton*, 351 Mass. 472, 475–479, where the cases relating to dairy farming are reviewed. Cf. also *Cumberland Farms of Conn. Inc.* v. *Zoning Bd. of Appeal of No. Attleborough*, 359 Mass. 68, 70, 73–74 (dealing with a statute clearly intended to affect local zoning ordinances and by-laws, because it is included in, and by way of amendment of, the zoning enabling act, G. L. c. 40A).

A mink ranch would probably not have been regarded as within the normal concept of a farm, or as an agricultural pursuit, in 1958 when the Middleborough by-law was adopted, or under the Massachusetts decisions just cited. Essentially the same question, as is now before us, was decided in *Commonwealth* v. *Proctor*, 355 Mass. 504, 505. Proctor was convicted of violating a Haverhill zoning ordinance (perhaps less restrictive than the by-law now to be interpreted) by raising mink in a residence and rural district.[3] This court sustained the conviction, holding that

---

[3] In such a district, the Haverhill ordinance (which the original papers show to have been adopted in 1956) permitted "[f]arms, market gardens, nurseries, and greenhouses." A farm was defined in the ordinance as "a tract of land devoted to agricultural purposes, including the raising of domestic or other animals, and including the buildings accessory to such agricultural purposes and the dwelling of the farmer." Another provision of the ordinance prohibited the "keeping of birds and animals . . . except on farms."

"mink are not included in the phrase, 'domestic or other animals,' and that the land was not 'devoted to agricultural purposes.' " The opinion proceeded (pp. 505–506), "Mink are not domestic animals within the meaning of the ordinance since the word 'domestic' as applied to animals ordinarily carries the meaning of 'tamed, associated with family life, accustomed to live in or near the habitations of men.' . . . Nor are the mink covered by the term, 'Other animals.' We think that these words 'including the raising of domestic or other animals' must be read with the words immediately preceding them, namely, 'a tract of land devoted to agricultural purposes.' This strongly suggests that the term, 'other animals,' refers only to those similar to domestic animals and of the sort commonly associated with agricultural pursuits."

The Moores contend that the Legislature has now expressly provided that mink are to be treated as domestic animals. See G. L. c. 128, § 8B, inserted by St. 1969, c. 37, § 2, quoted in the margin.[4] Chapter 128 deals with the regulatory activity of the State Department of Agriculture. A similar contention was dealt with in the *Proctor* case,

---

[4] Statute 1969, c. 37, is entitled "An Act placing the supervision of mink ranches under the department of agriculture." (See 1969 House Bill No. 1670.) The pertinent statutory provisions theretofore had appeared somewhat illogically in connection with provisions relating to the Department of Natural Resources. See G. L. c. 21, § 6A (as amended through St. 1965, c. 665, § 1), and c. 131, § 105A (inserted by St. 1950, c. 424, and repealed by St. 1967, c. 802, § 1). Section 8B of c. 128 reads (emphasis supplied): "Mink that have been propagated in captivity for two or more generations shall be considered domesticated mammals *subject to all the laws of the commonwealth* with reference to possession, ownership and taxation as are at any time applicable to domesticated animals; such domesticated mink and the pelts or products thereof shall be deemed agricultural products *and shall not be subject to the provisions of chapter one hundred and thirty-one.* The breeding, raising, producing in captivity and marketing thereof shall be deemed an agricultural pursuit. For the purposes of this section, a mink ranch shall be deemed to be any place where mink as defined by this section are raised and propagated in captivity. Each mink ranch shall be listed with the department . . . each year, and the premises and the breeding records may be inspected by the commissioner of agriculture . . . at any reasonable time. The fee for such listing shall be three dollars annually for which fee a certificate shall be issued by the department . . . . Such certificate shall be posted in a conspicuous place . . . at all times. The burden shall be upon the owner of such a ranch to prove that all mink possessed are domesticated as defined above. Whoever violates any provisions of this section shall be punished by a fine . . . ."

355 Mass. 504, 506, where this court said, "In support of his argument that the raising of mink made his premises a 'farm' the defendant relies on the fact that he held a certificate under G. L. c. 131, § 105A, and hence the mink were 'domesticated mink' and he was engaged in an 'agricultural pursuit.' . . . The classification of mink and mink raising under § 105A is irrelevant to an interpretation of the zoning ordinance. A 'farm' under the ordinance must be determined in the context of the ordinance and not by a statute dealing with a different objective." The court (see the *Proctor* case, 355 Mass. 504, 505, fn. 2) had already referred to the provisions of § 105A in some detail and had noted that similar provisions (see fn. 4, *supra*) had been inserted, as G. L. c. 128, § 8B, by St. 1969, c. 37, § 2.

*Lincoln* v. *Murphy*, 314 Mass. 16, 19–22, also supports the view that the Moores are not conducting a "farm" within the meaning of the by-law. There considerable emphasis was placed (pp. 19–20) upon the circumstance that no land was cultivated and that not "a pound of food furnished to the hogs . . . [was] produced upon the premises" there discussed. A similar situation exists in the present case (see fn. 1).

The present case is governed by the *Lincoln* and *Proctor* decisions. Viewed in the context of the Middleborough by-law, "farms" does not include this mink ranch. General Laws c. 128, § 8B, is not to be read as having affected, upon its enactment in 1969, town by-laws theretofore in existence any more than its 1950 predecessor statute (G. L. c. 131, § 105A), in the *Proctor* case, affected the 1956 Haverhill zoning ordinance (see fns. 3, 4, *supra*).

2. The final decree is reversed. A new final decree is to be entered declaring that the order of the zoning board of appeals was within the board's jurisdiction and that no modification of the order is required.

*So ordered.*